IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| BRYAN KERR DICKSON | § | |
| VS. | § | CIVIL ACTION NO. 1:14-CV-250 |
| UNITED STATES OF AMERICA | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Bryan Kerr Dickson ("Plaintiff"), an inmate formerly confined at USP Beaumont, proceeding *pro se*, filed this Federal Tort Claim ("FTCA") against the United States of America ("Defendant").

The above-styled action was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636 and the Local Rules for the Assignment of Duties to the United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

I. Procedural Background

On October 15, 2021, the Fifth Circuit Court of Appeals issued, by Mandate, a Judgment affirming in part and reversing in part the Judgment of the district court. *Dickson v. United States of America*, 11 F.4th 308 (5th Cir. 2021) (doc. #124). The Fifth Circuit affirmed the court's dismissal of all claims sounding in negligence but reversed the dismissal of the intentional tort claims. *Id.* Specifically, the Fifth Circuit remanded this case on two issues: (1) whether the BOP officials were acting within the scope of their employment when committing the alleged intentional torts of assault, battery, false arrest and abuse of process in determining the applicability of the law

1

enforcement proviso and (2) whether Plaintiff has properly pleaded a claim for intentional infliction of emotional distress.[1]  *Id.*

On October 26, 2021, the undersigned entered a Briefing Order affording the Defendant forty-five (45) days to file a brief outlining the case law and its analysis concerning the law enforcement proviso and whether the individual BOP officials in this case were acting within the scope of their employment when committing the alleged intentional torts of assault, battery, false arrest and abuse of process (doc. #126).  The Defendant was also ordered to provide Plaintiff a copy of their brief by certified mail return receipt that is docketed with the court.  *Id.*  The Briefing Order then gave Plaintiff sixty (60) days from receipt of Defendant's Brief to file a response.  *Id.*

On November 4, 2021, the Defendant filed a Motion to Unseal the Docket Sheet and Record in this matter (doc. #127).  Defendant then filed a Supplemental Brief in accordance with the Order entered October 26, 2021 (doc. #128).  Receiving no timely response from Plaintiff regarding the Defendant's Motion to Unseal, the undersigned entered an Order on December 14, 2021, granting the Motion (doc. #129).[2]  In addition, the Order instructed the Keeper of the Strikes List for the Eastern District of Texas to record the order and note that Plaintiff was now three-strikes barred relating to any future litigation.  *Id.*

_____

[1] The Fifth Circuit stated the question of whether the BOP officials were acting within the scope of their employment when committing the alleged intentional torts was a threshold jurisdictional issue that must be addressed before considering any alternative motion under Rule 12(b)(6).  In addition, with respect to Plaintiff's claim for intentional infliction of emotional distress, the Fifth Circuit stated Plaintiff's alleged conduct was not derivative of assault or false imprisonment and the court thus had subject matter jurisdiction over those claims.  However, the Fifth Circuit also stated that while jurisdiction over Plaintiff's intentional infliction of emotional distress claim may exist, it would make no comment on whether Plaintiff sufficiently plead this claim in order to survive a Rule 12(b)(6) motion.

[2] Plaintiff filed a Response on May 31, 2022, over six months past the date the motion was filed and over five months past the entry of the order (doc. #133).

In the Supplemental Brief, Defendant argues with respect to some of Plaintiff's intentional tort claims that the effect of the law enforcement proviso is to waive sovereign immunity as to those actions taken by the BOP officials who were acting within the scope of their employment (doc. #128). Although sovereign immunity has been waived with respect to the latter actions, Defendant contends Plaintiff fails to state a claim and these claims should be summarily dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). As to those actions taken by BOP officials that occurred outside the scope of employment, Defendant argues sovereign immunity is not waived and the court lacks jurisdiction over these claims pursuant to Federal Rule of Civil Procedure 12(b)(1).

Plaintiff ultimately filed a Response to the Defendant's Supplemental Brief on August 8, 2022 (doc. #140). The bulk of the response is nonsensical and dedicated to issues that are irrelevant. While Plaintiff acknowledges the law enforcement proviso and its application, Plaintiff appears to argue the individual BOP employees were not acting within the scope of their employment when he was assaulted and/or battered as their actions were "unauthorized," and contrary to BOP policy, their "core values" and "vision statement."[3] Plaintiff also, again, tries to revive his deliberate indifference claim that he specifically disavowed.[4]

This Report and Recommendation considers the issues on remand from the Fifth Circuit Court of Appeals as outlined above after considering the record and applicable law.

---

[3] Plaintiff does not appear to address any of his other claims.

[4] The Fifth Circuit acknowledged this in footnote 1 of their opinion stating, "In the district court, Dickson expressly disavowed that he was pursing constitutional claims pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Therefore, although Dickson appears to assert constitutional claims in his appellate brief, we decline to consider them." *Dickson v. United States*, 11 F.4th 308 (5th Cir. 2021). This court, again, declines to consider any claims under *Bivens*. To the extent Plaintiff attempts to raise new claims, they too will not be considered here.

II. Factual Background

As previously stated, the Fifth Circuit Court of Appeals upheld the court's determination that the court lacked subject matter jurisdiction over Plaintiff's negligence claims under the discretionary function exception. The only claims that remain on remand are Plaintiff's intentional tort claims of assault, battery,[5] false arrest,[6] abuse of process and intentional infliction of emotional distress.[7]

The following factual allegations are taken directly from Plaintiff's Original Complaint:

21.     That Bryan Kerr Dickson, ("Dickson") is a prisoner of the United States of America ("USA"). On around September 15, 2012 (09/15/12) was transferred from the United States Penitentiary - Cannon to the United States Penitentiary - Belmont.[8]

22.     That on above date Defendant (aka USA) Designation Center, knowing[ly] designated Dickson to a prison, knowing that his Central Files contained information about his charges, numerous separation orders as "to be separated from," concerning numerous problems with other results, numerous physically assaults, due to Dickson's charges.

23.     That the United States (USA), knowing[ly] and willfully and in full contrary to well established laws, assaulted Dickson by sending him to the United States Penitentiary - Belmont, knowing a battery by prisoners would occur.

24.     On around September 15, 2012 (09/15/12) upon Dickson's arrival at the institution, Dickson met with Doctor (Dr) Paul, Psychologist. Dickson strongly express to Dr Paul his fears of going to the yard, due to all the past

---

[5] Plaintiff refers to the intentional torts of assault and battery at times as one tort, "assault and battery." (Doc. #1, p. 4). Plaintiff also refers to the intentional tort of battery as excessive force. *Id.*, p. 5.

[6] Plaintiff appears to vacillate between the label false arrest and false imprisonment. When outlining the legal elements of the claim, Plaintiff refers to the claim as one for false imprisonment, appearing to argue he was confined in the Special Housing Unit ("SHU") longer than required. (Doc. #1, pp. 3-5).

[7] Plaintiff does not outline the legal elements for his claims of intentional infliction of emotional distress and abuse of process. (Doc. #1, generally).

[8] There is no USP Belmont in the federal bureau of prison systems. It is assumed that Plaintiff intended to write USP Beaumont.

assaults that Dickson has been put through.  Dr Paul told Dickson that this yard was a <u>NO PAPERWORK YARD AND THAT NO ONE SHOULD BE ASKING DICKSON FOR HIS PAPERWORK, WHICH</u> Dickson found out was <u>NOT TRUE</u>.  Against Dickson better judgment and the suggestions of Dr Paul that Dickson should try to make a new start and forget the past.

25.    Dickson met with two (2) SIS officers and Dr Paul after meeting with Dr Paul individually.  Again Dickson strongly express his fears of going to the yard, due to Dickson's charges and due to all the past assaults has been put through.  Again Dickson was told by them (SIS Officers) that this yard was a <u>No Paper Work Yard and That No One Should Be Asking You For Your Paperwork</u>, which again Dickson found out was <u>NOT TRUE</u>.  It was decided that Dickson should go to the <u>yard against his will</u>.

26.    That the United States (USA) knowing[ly] and willfully and in contrary to well established laws, assaulted Dickson by <u>forcing Dickson TO GO OUT TO THE YARD AGAINST HIS WILL</u>.

27.    For the first thirty (30) days, Inmate Smith, who's nickname is "Bulldog," prisoner named BJ, prisoner named McCallaster, who's nickname is "Stand Alone," pressured Dickson to show them Dickson's paperwork, which goes against what Dickson was told by Dr Paul and the two (2) SIS officers.

28.    Over the first thirty (30) days, Dickson met with Dr Paul on several occasions about these prisoners pressuring Dickson to show them his paperwork. Dickson also discuss[ed] with Dr Paul how Dickson was feeling threaten[ed] by these prisoners, due to his charges.  Dr Paul both called and e-mailed SIS about what Dickson was going through.

29.    That the United States (USA), knowingly and willfully and in contrary to well established laws, assaulted Dickson by allowing these three (3) prisoner to pressure Dickson to show them his paperwork.

30.    Over the first thirty (30) days, Dickson wrote several e-mails to SIS, concerning these three (3) prisoners that he write to the courts and get Dickson paperwork.  Dickson ask SIS to help resolve this problem, which they never did.

31.    Over the first thirty (30) days, Dickson went to the Lieutenant's Office on three (3) different occasions.  Dickson told both the Lieutenant and the Captain about three (3) prisoners, who were pressuring Dickson to show them his paperwork.  Dickson told them that Dickson felt "unsafe in the yard," due to Dickson charges and asked for "protective custody" and be housed in the

Special Housing Unit (SHU).  Dickson was denied on all three (3) occasions. Dickson was told on all three occasions that they [sic] was no threat to Dickson life and was sent back to the yard.  Dickson started his administrative remedies.

32.  On March 14, 2013 (03/14/13), Dickson was lying on his bunk listening to his radio when Smith came into Dickson's cell and pulled Dickson off his bunk using his cellie's cane.  Smith put Dickson in a vise like head lock. Dickson almost passed out, due to the vise like head lock.  The vise like head lock left a three (3) inch bruise on Dickson's neck.   The Federal Agents/Correctional Officers did not do anything to stop or prevent this from happening to Dickson.

33.  Dickson didn't report the incident, due to the past experiences with the Captain and the Lieutenant.  Dickson walked around for three (3) days back and forth from the chow hall, library, pill line, recreation, etc., and NONE OF THE FEDERAL AGENTS/Correctional Officers Noticed the BIG BLACK AND BLUE MARK ON DICKSON'S NECK, except Dr Paul, who noticed the big black blue mark on Dickson's neck.  Dickson explained to Dr Paul what happen.

34.  On Wednesday March 17, 2013 (03/17/13), Dickson was coming out of medical after having a medical appointment, when the Federal Agent/Correctional Officer, who was assigned to medical, noticed the big black and blue mark on Dickson's neck and asked Dickson what happened. Dickson explained to the Federal Agent/Correctional Officer what happened.

35.  Dickson was immediately escorted to the Lieutenant's Office.  Dickson explained what happened to the Captain.  Dickson explained why he didn't report it earlier, due to past experiences with the Captain and the Lieutenant. The Captain again did not believe Dickson and threaten[ed] to send Dickson back to the yard.  This again show that the Captain had no concern for Dickson's Safety.

36.  Dickson was placed in the Special Housing Unit ("SHU") under a SIS Threat Assessment.

37.  While Dickson was in the SHU, he received back his Sensitive BP-9, concerning Dickson's safety.  Mr. Fox, Warden did a threat assessment on Dickson and stated that there was NO THREAT TO DICKSON'S LIFE and that Dickson should accept regular housing in general population.

38.     Consequently the Defendant Denied Dickson Access to the Law Library his entire stay in the SHU, Issuance of Remedies Forms, Any books to read, Adequate clothing, Personal hygiene items, upon information and beliefs, due to Dickson's charges.

39.     This complaint further invokes the refusal to follow the issuance of Administrative Remedies for the Administrative Remedies Process.  See 28 CFR 542, et seq and Lewis vs. Casey, 518 US 343, 347 (1996).  As well as the Denial of Mental Health Treatment found at 28 CFR 549, 70-72 and (P.S 6031.03).

40.     On numerous occasions, Dickson was told by several Federal Agents/Correctional Officers to do them a big favor and just kill yourself, due to information and beliefs, due to Dickson's charges.

41.     SO Rosegrant, SO Giech and several other Federal Agents/Correctional Officers, who worked the second shift in the Special Housing Unit (SHU) purposely destroyed several affidavits, which are legal documents, that my cellie Mr. Pettengill, Reg # 53539-019 wrote concerning the abusive behaviors that Dickson received from Lieutenant Russo, SO Rosegrant, SO Geich and several other Federal Agents/Correctional Officers, who worked in the SHU at the United States Penitentiary - Belmont, due to information and beliefs, due to Dickson's charges.

42.     Dickson was pulled out of his cell at least twice a week, due to the fact that Dickson was on razor restriction, due to the fact that Dickson tried to cut his wrist six (6) months earlier, due to all the stress that Dickson has been put through, due to information and beliefs, due to Dickson's charges.

43.     Dickson was brought to either a holding cell or a empty room with just a shower in it.  The Federal Agents/Correctional Officers purposely would urinate in the room, as there was several puddles of urine and the strong smell of urine, due to information and beliefs due to Dickson's charges.

44.     Dickson was forced to stripe down while SO Rosegrant, SO Geich and several other Federal Agents/Correctional Officers, who worked second (2nd) shift in the SHU would make fun of the size of Dickson's dick and butt.

45.     Dickson was left completely nude for extended periods of time, with no protections for his feet.

46.     SO Rosegrant, SO Geich and several other Federal Agents/Correctional Officers, who worked second (2nd) shift at the Special Housing Unit

7

("SHU") at the United States Penitentiary - Belmont, would make fun of Dickson through the window, due to information and beliefs, due to Dickson's charges.

47.  Dickson was forced to eat in the same room, on several occasions while Dickson was left nude.

48.  SO Rosegrant, SO Geich and several other Federal Agents/Correctional Officers, who worked on (2nd) second shift in the SHU, would either piss or put soap in Dickson's food, due to information and beliefs, due to Dickson's charges.

49.  On February 03, 2013 (02/03/13), Dickson was feeling very suicidal, due to all the abuse that Dickson has been put through. Dickson saw Lieutenant Russo during rounds on the range. After Dickson got Russo attention, Dickson told Lieutenant Russo that Dickson was feeling very suicidal and asked Lieutenant Russo to contact someone from the Psychological Department. Lieutenant Russo refused to contact someone from the Psychology Department, which goes against Federal Bureau of Prison Policy, and the memo dated June 20, 2012 (06/20/12) from Mr Charles E Samuels, Jr, Director of the Federal Bureau of Prisons on Suicide Prevention. Lieutenant Russo told Dickson to go ahead and hang himself. Dickson then hung himself. Lieutenant Russo and several other Federal Agents/Correctional Officers came into Dickson's cell and purposely hit Dickson in the head with a plastic shield while Dickson was hanging semi-conscious leaving a two (2) inch mark across Dickson's forehead. This was all witness by Mr Pettengill, my cellie. Mr Pettengill is willing to testify in court about what happened. Pictures were taken of Dickson's forehead.

50.  Dickson Was Purposely Placed With Other Prisoners, just so Dickson would be Seriously Hurt or Killed, due to information and beliefs, due to Dickson's charges.

51.  On February 12, 2013 (02/12/13), while Dickson was in the SHU, Lieutenant Russo, Purposely Without Any Regard For Dickson's Safety, placed Dickson with K, Lowery, Reg. # 43446-008 For The Sole Purpose To Get Dickson Seriously Hurt or Killed, due to information and beliefs, due to Dickson's charges.

52.  Within five (5) after we were placed together. Dickson was pulled off the top bunk and physically assaulted by Lowery. Dickson banged on the cell door and hit the "Panic Button" while fending off Lowery. When Lieutenant Russo and the two (2) Federal Agents/Correctional Officers showed up at

Dickson's cell. Dickson was pushed to the window and Lowery asked Lieutenant Russo and the two (2) Federal Agents/Correctional Officers laughed and walked away. Then Lowery physically assaulted Dickson some more. Dickson again banged on the cell door and hit the "Panic Button," while again fending off Lowery. When Lieutenant Russo and the two (2) Federal Agents/Correctional Officers finally showed up again, they saw all of Dickson's injuries, both Lowery and Dickson were handcuffed and taken to a holding cell. The medical personnel did a Medical Assessment on Dickson received a Broken Nose and damage to Right (R) Eye Socket.

53.    Dickson tried to press Assault, Battery, Violation of the Federal Hate Crime Law, due to Dickson's charges, which were denied.

54.    Dickson also put in several Medical Sick Call Slips to have Eye Exam and Prescription Eyeglasses. Dickson has been without Eyeglasses since June 27, 2012 (06/27/12) (For the last eighteen (18) months).

55.    Dickson has submitted several Medical Sick Call Slips to be examined by a Orthopedist, Due to Several Pain in Both Knees, Bone Spurs in Both Knees, Osteoarthritis in Both Knees. Dickson has been told by five (5) different doctors that Dickson needs double knee replacements, which they refuse to do.

(Doc. #1, pp. 6-14) (errors in the original).

III.  Standards of Review

*A. Subject Matter Jurisdiction*

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of an action if the court lacks jurisdiction over the subject matter of the plaintiff's complaint. FED. R. CIV. P. 12(b)(1). The Rule allows a party to challenge the subject-matter jurisdiction of a district court based on: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996). The party asserting the existence of jurisdiction bears the burden of proof once a court's subject-matter jurisdiction is

challenged.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### B.  Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  To defeat a Rule 12(b)(6) motion to dismiss, a plaintiff must "nudge their claims across the line from conceivable to plausible" by pleading "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).  However, the court does not "strain to find inferences favorable to plaintiff" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 361 (5th Cir. 2004) (internal quotation marks and citations omitted).

## IV.  <u>Analysis</u>

### A.  Federal Tort Claims Act

"'In 1946, Congress passed the FTCA, which waived sovereign immunity of the United States for certain torts committed by federal employees' acting within the scope of their employment." *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994)).  A claim is actionable if it alleges these six elements of 28 U.S.C. § 1346(b): (1) against the United States, (2) for money damages, (3) for injury or loss of property, or personal injury or death, (4) caused by the negligent or wrongful act or omission of any employee of the

Government, (5) while acting within the scope of his office or employment, (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.  *Id.*

In cases involving sovereign immunity, the "'merits and jurisdiction will sometimes come intertwined,' and a court can decide 'all. . . of the merits issues' in resolving a jurisdictional question, or vice versa."  *Brownback*, 141 S. Ct. at 749 (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017)).  Thus, while a plaintiff "need not *prove* a § 1346(b)(1) jurisdictional element for a court to maintain subject-matter jurisdiction over his claim," he "must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim." *Id.* (emphasis in original); *accord C.M. v. United States*, No. 5:21-CV-0234, 2023 WL 3261612, *17 (W.D. Tex. 2023).  "[I]n the unique context of the FTCA all elements of a meritorious claim are also jurisdictional."  *Brownback*, 141 S. Ct. at 749 (quoting *Meyer*, 510 U.S. at 477).  Where a plaintiff fails to plausibly allege an element that falls under both a merit element of a claim and a jurisdictional element, a court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6) or both. *Id.* at 749, n.8; *but see Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004) (noting that where there is an "intertwined attack" on jurisdiction and merits, "resolution of the jurisdictional issue on a 12(b)(1) motion [is] improper.").

B. *Law Enforcement Proviso*

Under the intentional tort exception, the federal courts generally lack FTCA jurisdiction over [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights. 28

U.S.C. § 2680(h).  However, § 2680(h) does not eliminate FTCA jurisdiction in all circumstances. It contains a law enforcement proviso that retains jurisdiction with respect to the "acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest."  *Millbrook v. United States*, 569 U.S. 50, 57 (2013).  In general, BOP officials are law enforcement officers within the meaning of § 2680(h).  *See Chapa v. U.S. Dep't of Justice*, 339 F.3d 388, 390 (5th Cir.2003) (relying on *Carlson v. Green*, 446 U.S. 14 (1980)).

To hold the United States liable under the FTCA, the tortious conduct must occur within the scope of employment.  *Dickson v. United States*, 11 F.4th at 314 (citing *Millbrook*, 569 U.S. at 57). Whether an action falls within the scope of employment is governed by state law.  28 U.S.C. § 1346(b)(1); *Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006) (citing *Williams v. United States*, 350 U.S. 857 (1955) and *Rodriguez v. Sarabyn*, 129 F.3d 760, 766 (5th Cir. 1997)).  Under Texas law, "an employee's conduct is considered to fall within the scope of his employment if his actions were (1) within the general authority given him; (2) in furtherance of the employer's business; and (3) for the accomplishment of the object for which the employee was employed."  *See e.g., Goodyear Tire & Rubber Co.*, 236 S.W.3d 754, 757 (Tex. 2007); *Bodin*, 462 F.3d at 484 (citations and internal quotation marks omitted); *Counts v. Guevara*, 328 F.3d 212, 214 (5th Cir. 2003).  "The employee's acts must be of the same general nature as the conduct authorized or incidental to the conduct authorized to be within the scope of employment."  *Goodyear*, 236 S.W.3d at 757.

However, "when the servant turns aside, for however short a time, from the prosecution of the master's work to engage in an affair wholly his own, he ceases to act for the master, and the responsibility for that which he does in pursuing his own business or pleasure is upon him alone." *Bodin*, 462 F.3d at 48 (quoting *Tex. & Pac. Ry. Co. v. Hagenloh*, 247 S.W.2d 236, 241 (Tex. 1952)). Thus, "if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Goodyear*, 236 S.W.3d at 757 (quoting *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002)).

Accepting Plaintiff's allegations as true, the undersigned turns to the question of whether the individual officers were acting within the scope of their employment when committing the alleged intentional torts of assault, battery, false arrest and abuse of process.

### 1. *Assault & Battery*

"Texas courts have recognized private causes of action for both assault and battery for well over a century." *M.D.C.G. v. United States*, No. 7:15-CV-552, 2016 WL 6638845, at *5 (S.D. Tex. 2016) (quoting *City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014)). "These two intentional torts are related, but conceptually distinct." *Id*. "An assault occurs when a person is in apprehension of imminent bodily contact, whereas a battery is committed when an individual actually sustains a harmful or offensive contact to his or her person." *Id*. "Today, the Texas Penal Code combines common-law concepts of assault and battery," providing that a person commits an "assault" if he either:

> (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;
>
> (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

(3) intentionally or knowingly causes physical contact with another when the person
knows or should reasonably believe that the other will regard the contact as offensive
or provocative.

*City of Watauga*, 434 S.W.3d at 589 (noting that the second element, threatens, "mirrors the

traditional notion of common-law assault" while the others correspond with common law battery);

*see also* Texas Penal Code § 22.01(a).  "Reliance on the criminal-assault statute has led several

Texas civil courts to meld common-law concepts of assault and battery under the rubric of assault."

*City of Watauga*, 434 S.W.3d at 589-90.  The Second Restatement of Torts similarly identifies two

forms of battery: one form that results in harmful bodily contact and another that results in offensive

bodily contact.  RESTATEMENT (SECOND) OF TORTS §§ 13, 18 (1965).

In the present case, Plaintiff alleges the BOP officials assaulted him when they knowingly

and willfully  (1) sent him to USP Beaumont "knowing a battery by prisoners would occur" (doc.

#1, ¶ 23); (2)  forced Plaintiff "to go out to the yard against his will" (doc. #1, ¶ 26); and (3) allowed

three prisoners to "pressure Dickson to show them his paperwork" (doc. #1, ¶ 29).  In addition,

Plaintiff appears to allege the BOP officials assaulted him by setting him up for a battery by other

inmates through cell placements because of prior convictions for possession and production of child

pornography (doc. #1, ¶¶ 50-52).

Plaintiff's first three claims involve the BOP officials' decision-making process in

transferring Plaintiff to USP Beaumont and then housing him in general population and ultimately

in protective custody.  (Doc. #1, ¶¶ 22-29).  These actions were clearly within the scope of

employment for the BOP officials and are more akin to Plaintiff's negligence claims regarding his

placement and classification at USP Beaumont.  As contemplated by the discretionary function

exception, placement and classification decisions for prisoners are the types of acts that are

authorized or incidental to the conduct authorized for BOP officials. *Goodyear*, 236 S.W.3d at 757. The Fifth Circuit affirmed the court's previous determination that the court lacked jurisdiction over these claims under the discretionary function exception. *See Dickson*, 11 F.4th at 313.

However, to the extent Plaintiff asserts these same BOP officials actually planned and scripted his demise in setting him up to be hurt or killed in making these placements, which actually resulted in him being physically beaten by other inmates, the undersigned finds that such actions cannot fall within the scope of employment (doc. #1, ¶¶ 32; 50-52). "It is not ordinarily within the scope of a servant's authority to commit an assault on a third person." *Bodin*, 462 F.3d at 485 (citing *Tex. & P. Ry. Co.*, 247 S.W.2d at 241 (quoting *Galveston, H & S.A. Ry. Co. v. Currie*, 96 S.W. 1073, 1074 (1906)). The same can be true for intentionally planning or setting up an inmate to be hurt or killed.[9] *Cf., Cantu v. Jones*, 293 F.3d 839 (5th Cir. 2002) (on a claim of deliberate indifference, noting the jury found the appellants essentially orchestrated the attack on an inmate and that it was "in no way reasonable behavior for a prison official").[10] The plaintiff bears the burden of proving

---

[9] Defendant argues this claim is just a creative spin on Plaintiff's negligence claim for failing to protect him or his general challenge to his housing assignments. (Doc. #128, p. 6). The undersigned, however, is required to analyze all well pleaded facts as true. Here, Plaintiff specifically pleads the intent of BOP officials to plan his "demise" and set up him for an assault. Plaintiff even alleges the BOP officials placed him in a cell with another inmate for the sole purpose to get him hurt or killed (doc. #1, ¶ 51). This appears to be separate and distinct from Plaintiff's claim of negligence. This is consistent with the construction of Plaintiff's allegations in the first Report and Recommendation. (Doc. #98, p. 10).

[10] The undersigned notes that the analysis may be different if Plaintiff's allegations involved a use of force against him by BOP officers directly or if they failed to protect him from an attack by another inmate. "The nature of the employment may be such as necessary to involve at times the use of force . . . so that the act of using force may be in furtherance of the employer's business, making him liable even when greater force is used than is necessary," and "even though the master has expressly forbidden the particular act. . . . ." *M.D.C.G.*, 2016 WL 6638845, at *6 (quoting *Tex. & P. Ry. Co.*, 247 S.W.2d at 239). In determining whether an assault was committed in the scope of employment, Texas courts consider "whether the assault was so connected with and immediately arising out of authorized employment tasks as to merge the task and the assaultive conduct into one indivisible tort imputed to the employer. *Id* (quoting *Buck v. Blum*, 130 S.W.3d 285, 289 (Tex. App. – Houston [14th Dist.] 2004, no pet.)). Here, Plaintiff alleges the

that the employee acted for reasons other than personal animus. *Bodin*, 462 F.3d at 485 (citing *Garrett v. Great W. Distrib. Co. Of Amarillo*, 129 S.W.3d 797, 800 (Tex. App. – Amarillo 2004, pet. denied)); *cf., M.D.C.G.*, 2016 WL 6638845, at *9 ("Although the assaults may have been *facilitated* by Manzanares's duties and authority to use force, they were not so *connected* with the purpose and authority given him by CBP as to render his actions within the scope of his employment."). And while the latter is normally a question of fact, and not law, Plaintiff here specifically pleads personal animus due to his convictions for possession and production of child pornography. *M.D.C.G.*, 2016 WL 6638845, at *9 ("The Court agrees with Plaintiffs that the scope inquiry is a factually intensive one, but in this case, the detailed, pleaded facts are dispositive. It is irrelevant what Manzanares's actual motive was — personal animosity or, as Plaintiffs posit, 'a desire and need for power and control over others' — since the record makes clear that his motive was not his employers."). In addition, as outlined above, Plaintiff, in his supplemental response, appears to concede the BOP employees were not acting within the scope of their employment relating to his allegations of assault and battery.

As previously stated, "if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Peteet v. Hawkins*, No. H-17-1312, 2018 WL 4039375, at *4 (S.D. Tex. 2018) (citing *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2001)). The BOP is tasked with providing the safekeeping, care, and subsistence for all federal prisoners under 18 U.S.C. § 4042(a) and any intentional conduct by BOP officials in setting Plaintiff up to be hurt or killed runs contrary to this duty and cannot be

---

BOP officials placed him in a cell for the sole purpose to get him hurt or killed.

considered to be authorized or incidental to the conduct authorized for BOP officials.  *Goodyear*, 236 S.W.3d at 757.  With this claim, the law enforcement proviso does not apply and sovereign immunity remains intact; the court does not have subject matter jurisdiction over any such claim.

While Plaintiff invokes the legal claim of battery, Plaintiff's factual allegations supporting such a claim are sparse, particularly as to any BOP employee.  As outlined above in his legal claims, Plaintiff appears, at times, to equate battery with excessive force.  Giving Plaintiff's pleadings the most liberal construction, it would appear Plaintiff alleges the BOP officials committed a battery when they physically contacted his person when responding to his attempt to commit suicide by hanging himself (doc. #1, ¶ 49).  Specifically, Plaintiff states, "Lieutenant Russo and several other Federal Agents/Correctional Officers came into Dickson's cell and ***purposely*** hit Dickson in the head with a plastic shield while Dickson was hanging semi-conscious leaving a two (2) inch mark across Dickson's forehead."  *Id.* (emphasis added).

Plaintiff has sufficiently plead a claim for civil battery.  *See* Texas Penal Code § 22.01(a)(1).  And while responding to an inmates' attempt of suicide is certainly within the scope of employment for BOP officials, intentionally striking a "semi-conscious" inmate who just attempted to commit suicide by hanging cannot be said to be within the BOP's responsibility to provide for the safekeeping, care, and subsistence for all federal prisoners under 18 U.S.C. § 4042(a) under the facts alleged.  Plaintiff's allegation of battery coupled with his assertion that Russo refused to call the Psychology Department for help at Plaintiff's request and suggestion for Plaintiff to go ahead and hang himself immediately preceding the suicide attempt, support a finding that the BOP employees were not acting within the scope of their employment in responding to the suicide

(¶ 49).[11]  Again, the plaintiff bears the burden of proving that the employee acted for reasons other than personal animus and Plaintiff specifically and consistently pleads the BOP officials acted with personal animus against him throughout his pleadings.  *Bodin*, 462 F.3d at 485 (citing *Garrett*, 129 S.W.3d at 800).  Moreover, as outlined above, Plaintiff, in his supplemental response, appears to concede the BOP employees were not acting within the scope of their employment relating to his allegations of assault and battery.  Thus, the law enforcement proviso does not apply and sovereign immunity remains intact; the court does not have subject matter jurisdiction over any such claim.

### 2.  False Arrest/False Imprisonment

Plaintiff's claim of false arrest/false imprisonment is less than clear and, at best, is conclusory.  In outlining the legal elements of the claim, Plaintiff refers to the claim as one for false imprisonment, appearing to argue he was confined in the SHU longer than required.  (Doc. #1, p. 3 & 5).[12]  In outlining the facts supporting his claim, Plaintiff confirms he "was placed in the Special Housing Unit ("SHU") under a SIS Threat Assessment."  (Doc. #1, ¶ 36).  Plaintiff generally references his due process rights under *Wolff v. McDonnell*, 418 U.S. 539 (197) and *Sandin v. Conner*, 515 U.S. 472 (1995), but offers no additional specifics as to this claim.

Regardless, in Texas, civil liability for both false arrest and false imprisonment will attach when: (1) there is a willful detention; (2) against the consent of the party detained;  and (3) the detention is without the authority of law.  *McElroy v. United States*, 861 F. Supp. 585, 595 (W.D.

---

[11] In analyzing Plaintiff's claim of battery, Defendant overlooks these additional facts.  If Plaintiff merely alleged the BOP employees hit him with the shield while responding to the suicide, the court agrees such actions would plausibly be within the scope of employment.  Defendant also overlooks Plaintiff's consistent allegation that the BOP employees acted with personal animus against him with the intent to kill him.

[12] As noted above, Plaintiff vacillates between false arrest and false imprisonment.

Tex. 1994) (citing *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985)). "No action will lie against an officer for false arrest or false imprisonment where the detention was executed by virtue of legally sufficient process duly issued by a court of competent jurisdiction." *Id.* (quoting *Pete v. Metcalfe*, 8 F.3d 214, 218-19 (5th Cir. 1993)). In evaluating this claim, the court cannot ignore Plaintiff's additional allegations that he was forced to go into general population against his will and asked to be placed in protective custody and to be housed in the SHU (doc. #1, ¶¶ 25 & 26). *Southland*, 365 F.3d at 351 (a court does not "strain to find inferences favorable to plaintiff" or "accept conclusory allegations, unwarranted deductions, or legal conclusions"). With Plaintiff's admission that he requested to be placed in the SHU, Plaintiff fails to meet the elements of a claim for false arrest or false imprisonment under Texas law, namely his lack of consent. Thus, Plaintiff has failed to plausibly allege a claim under Texas law as required for subject-matter jurisdiction under the FTCA. *Brownback*, 141 S. Ct. at 749. Moreover, while it can be said that in evaluating Plaintiff's request for protective custody in the SHU, the BOP employees were clearly acting within the scope of their employment, this court previously dismissed any claim that the BOP employees were negligent in making such decisions. *Dickson*, 11 F.4th at 313.

### 3. Abuse of Process

The basic principle behind the tort of abuse of process is as follows: "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." *Restatement (Second) of Torts § 682.* A claim for abuse of process falls under the rubric of "common law torts which protect the interest in freedom from unjustified litigation," including "malicious prosecution" and "wrongful civil proceedings." *Sisk v. Levings*, 868 F.2d 159, 161 (5th

Cir. 1989) (citing *Beker Phosphate Corp. v. Muirhead*, 581 F.2d 1187, 1188 n. 1 (5th Cir. 1978)). Abuse of process is comprised of three elements: "(1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process, and (3) damage to the plaintiff as a result of such illegal act." *Graham v. Mary Kay, Inc.*, 25 S.W.3d 749, 756 (Tex. App – Houston [14th Dist.] 2000). Here, Plaintiff has failed to allege a legal process by which Defendant caused damages to him through an illegal, perverted, or improper use. Nothing in Plaintiff's Original Complaint indicates the legal process to which Plaintiff refers to as it relates to his claim for abuse of process. Nor does Plaintiff's complaint offer any details regarding whether the BOP employees were acting within the scope of their employment with respect to the alleged abuse of process. Where a complaint asserts merely conclusory allegations, these conclusory allegations and unwarranted deductions of fact are not admitted as true. *Ashcroft*, 556 U.S. at 678-681 (quoting *Twombly*, 550 U.S. 555-556). Like Plaintiff's claim for false arrest/false imprisonment, Plaintiff has failed to plausibly allege a claim under Texas law as required for subject-matter jurisdiction under the FTCA. *Brownback*, 141 S. Ct. at 749.

## C. Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress is not an intentional tort that is excepted from the FTCA's waiver of sovereign immunity. *Dickson*, 11 F.4th at 314, n. 3 (citing *Truman v. United States*, 26 F.3d 592, 593 (5th Cir. 1994)). Thus, while the law enforcement proviso is not applicable, the court still must determine (1) whether Plaintiff has sufficiently plead all the elements of an IIED claim under Texas law and (2) whether Plaintiff has sufficiently plead all six of the elements to state

an actionable claim under the FTCA.[13]  One of those elements includes whether Plaintiff has plausibly alleged that the BOP employees were acting within the scope of their employment while allegedly committing the intentional infliction of emotional distress.  As recognized in *Brownback*, "in the unique context of the FTCA all elements of a meritorious claim are also jurisdictional."  141 S. Ct. at 749 (quoting *Meyer*, 510 U.S. at 477).

Under Texas law, the elements of a claim for intentional infliction of emotional distress are "(1) the defendant acted intentionally and recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe."  *Peteet*, 2018 WL 4039375 at *5 (quoting *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1988)).  "Conduct is actionable only when it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)).  "Whether conduct is extreme and outrageous is a question of law for the courts to be analyzed on a case-by-case basis, and only when reasonable minds may differ will the question be presented to a jury."  *Id*. (citing *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 817 (Tex. 2005) and *Tille*r, 121 S.W.3d at 713)).

---

[13] A claim is actionable if it alleges these six elements of 28 U.S.C. § 1346(b): (1) against the United States, (2) for money damages, (3) for injury or loss of property, or personal injury or death, (4) caused by the negligent or wrongful act or omission of any employee of the Government, (5) while acting within the scope of his office or employment, (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *Brownback*, 141 S. Ct. at 749.

As with Plaintiff's claim of abuse of process, Plaintiff fails to outline the elements of this claim and fails to outline any facts as it relates specifically to any claim of intentional infliction of emotional distress. Giving Plaintiff the most liberal construction, however, the court finds that Plaintiff has alleged facts that support a claim for intentional infliction of emotional distress, especially when coupled with Plaintiff's consistent allegation that the BOP employees acted with personal animus against him with the intent to have him killed. For example, Plaintiff complains that BOP employees told him "to do them a big favor and just kill yourself" (doc. #1, ¶ 40) and to "go ahead and hang himself" (doc. #1, ¶ 49). Staff also allegedly harassed him by destroying his legal documents (doc. #1, ¶ 41), excessively pulling him from his cell (doc. #1, ¶ 42), leaving him in a holding cell that was contaminated with urine for excessive lengths of time (doc. #1, ¶ 43), stripping him of his clothing and leaving him nude for excessive lengths of time (doc. #1, ¶ 45), forcing him to eat while nude (doc. #1, ¶ 47), teasing him about his genitals and buttocks (doc. #1, ¶ 44), and tampering with his food (doc. #1, ¶ 48). The question turns then as to whether Plaintiff has sufficiently alleged the BOP employees were acting within the scope of their employment to waive sovereign immunity.[14]  As stated before, the court cannot ignore the tenor of Plaintiff's consistent complaint that the BOP employees targeted him, were out to get him, were setting him up to be assaulted and even killed, and even went so far as to tell him to kill himself. Plaintiff's complaint describes an inhumane environment allegedly intentionally created through consistent harassment, humiliation and degradation that resulted in his alleged emotional distress.

---

[14] The court notes again that Plaintiff had the opportunity to file supplemental briefing to further elucidate the court on this question. While primarily focusing on his claims of assault and battery, Plaintiff was consistent in his allegations that the BOP failed to follow their mission in providing his care and safekeeping and violated BOP policy and procedure in failing to do so.

Again, the BOP is tasked with providing the safekeeping, care, and subsistence for all federal prisoners under 18 U.S.C. § 4042(a) and any such intentional conduct by BOP officials is contrary to this duty and cannot be considered to be authorized or incidental to the conduct authorized for BOP officials.  *See e.g.*, Program Statement § 5324.08(3)(b) (BOP employees are trained and required to "act to prevent suicides with appropriate sensitivity, supervision, and referrals");[15] § 5324.06(1) (the BOP has a zero-tolerance policy "toward all forms of sexual activity, including sexual abuse and sexual harassment");[16] and § 4700.06 ("Inmates will be provided with nutritionally adequate meals prepared and served in a manner that meets established Government health and safety codes).[17]  Moreover, "[n]umerous courts have found that sexual assault falls outside the scope of employment, as it is clearly motivated by personal reasons."  *Peteet v. Hawkins*, 2018 WL 4039375, at *4 (collecting cases that hold sexual abuse to be outside the scope of employment for prison guards).

As the court finds that Plaintiff has failed to allege the BOP employees were acting within the scope of their employment while committing the alleged tort of intentional infliction of emotional distress, sovereign immunity is not waived, and the court lacks subject matter jurisdiction over this claim.  *Bodin*, 462 F.3d at 484 ("The plaintiff bears the burden of proving that the employee acted for reasons other than personal animus); *Goodman*, 80 S.W.3d at 577 ("[F]or an employee's acts to be within the scope of employment, 'the conduct must be of the same general nature as that authorized or incidental the conduct authorized.'"); *Brownback*, 141 S. Ct. at 745 (listing elements

---

[15] https://www.bop.gov/policy/progstat/5324_008.pdf

[16] https://www.bop.gov/policy/progstat/5324_012.pdf

[17] https://www.bop.gov/policy/progstat/4700_006.pdf.

for actionable FTCA claim).

V.  Recommendation

Plaintiff's complaint filed pursuant to the FTCA should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and/or for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

VI.  Objections

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings of facts, conclusions of law and recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(c).

Failure to file written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within fourteen (14) days after service shall bar an aggrieved party from the entitlement of *de novo* review by the district court of the proposed findings, conclusions and recommendations and from appellate review of factual findings and legal conclusions accepted by the district court except on grounds of plain error.  *Douglass v. United Servs. Auto. Assoc'n.,* 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

**SIGNED this the 11th day of January, 2024.**

_____
Christine L Stetson
UNITED STATES MAGISTRATE JUDGE